[Cite as *State v. Aekins*, 2023-Ohio-322.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 21AP-630<br>(C.P.C. No. 17CR-5968) |
| Jordan M. Aekins, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 2, 2023

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee. **Argued:** *Paula M. Sawyers.*

**On brief:** *Carpenter, Lipps & Leland, L.L.P., Kort Gatterdam*, and *Erik P. Henry*, for appellant. **Argued:** *Kort Gatterdam.*

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Jordan M. Aekins, appeals from the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding him guilty of four counts of murder, one count of attempted murder, and one count of felonious assault, all with firearm specifications, and one count of tampering with evidence. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} By indictment filed November 2, 2017, plaintiff-appellee, State of Ohio, charged appellant with four counts of murder, in violation of R.C. 2903.02, unclassified felonies; one count of attempted murder, in violation of R.C. 2923.02 and 2903.02, a felony of the first degree; one count of felonious assault, in violation of R.C. 2903.11, a felony of

the second degree; and one count of tampering with evidence, in violation of R.C. 2921.12, a felony of the third degree. The murder, attempted murder, and felonious assault charges each carried firearm specifications pursuant to R.C. 2941.145(A). The indictment arose from an October 24, 2017 shooting incident.

{¶ 3} On October 24, 2017, Melisa Mora picked up her 17-year-old sister, Jojo Holloway, and drove to Brent Black's apartment, located at 4026 Alwood Lane in the Winchester Park apartment complex. Black was the father of Mora's eldest child. As Mora and Holloway entered the apartment at approximately 1:30 p.m., Mora saw Black and another man she did not know sitting on the couch. Mora described the other man as an average sized African-American male with facial hair, approximately five-foot seven-inches tall and 30 years old, wearing a black hooded sweatshirt (a "hoodie"), jeans, and shoes. (Tr. Vol. II at 194.) Mora noted the man had the hood of his hoodie pulled up. Mora said hello to the man, but he did not respond.

{¶ 4} Mora went into the kitchen of the apartment and began cooking spaghetti. When Black walked into the kitchen, Mora informed Black she thought the other man seemed rude and "a little suspicious." (Tr. Vol. II at 196.) Black "cleared up" Mora's concerns, informing her that the man was "his people, maybe his neighbor or friend or whatever." (Tr. Vol. II at 196.)

{¶ 5} Mora and Holloway then started folding laundry on the kitchen table. The kitchen, kitchen table, and living room were all located in the same open area in Black's apartment. When Mora and Holloway finished folding laundry, Holloway sat down on the couch in the living room and Mora continued cooking in the kitchen. Black and the neighbor/friend then sat at the kitchen table and began smoking marijuana. Mora noted the men were not arguing, and were having "a real quiet, short-answer conversation." (Tr. Vol. II at 198.)

{¶ 6} As Mora was standing in the kitchen, she suddenly heard loud noises that sounded like fireworks. Mora felt a burning sensation, saw a big gash in her arm, and a bullet next to her. Mora heard two or three more loud noises and felt a burning sensation on her back. Mora fell to the kitchen floor and realized she had been shot.

{¶ 7} When Mora got up, the room was empty and the neighbor/friend was no longer in the apartment. Mora noted the back door of the apartment, which led out to a

balcony, was open.  Mora saw that Black and Holloway had both been shot and were bleeding.  Mora called 911.

{¶ 8}  Shortly thereafter, police and paramedics began arriving on the scene. Officer Kiara Husband of the Columbus Police Department ("CPD") arrived at 4026 Alwood Lane at 2:20 p.m. on October 24, 2017.  When Officer Husband entered the apartment, Mora was "screaming" and indicated she and two other people in the apartment had been shot. (Tr. Vol. II at 253.)  Officer Husband observed a woman on the couch with a bullet wound to her head who appeared deceased, and a male lying on the ground who had been shot and was "still groaning but [in] very bad shape." (Tr. Vol. II at 254.)  Mora described the suspect to Officer Husband and another officer who had arrived on the scene as "Male black, 27 to 30 years of age, approximately five-seven, all black clothing with facial hair." (Tr. Vol. II at 270.)  Officer Husband radioed the description of the suspect to the other officers searching in the area.

{¶ 9}  CPD Sergeant ("Sgt.") Lee Hurst responded to the call of a shooting at the Winchester Park apartment complex on October 24, 2017 and began searching for the suspect.  As Sgt. Hurst drove toward the back of the apartment complex, he noticed a man walking in the grass who was wearing all black clothing.  Sgt. Hurst drove his police cruiser closer to the man.  When Sgt. Hurst was approximately 15 feet away, the man "looked at [Sgt. Hurst]," and Sgt. Hurst realized the man "matched the description to a T with the facial hair, male black," wearing "all black." (Tr. Vol. II at 279.)  "As soon as [the suspect] looked" at Sgt. Hurst, the man's "eyes g[o]t real big and he gave the look of panic" and then "immediately took off running." (Tr. Vol. II at 280.)  Sgt. Hurst then realized, "that's him." (Tr. Vol. II at 280.)

{¶ 10}  Sgt. Hurst threw his vehicle into park and took off running after the suspect. Sgt. Hurst yelled "stop," but the suspect did not stop. (Tr. Vol. II at 282.)  When the suspect ran around one of the apartment buildings, Sgt. Hurst lost sight of him.  Sgt. Hurst "pied off the corner" of the apartment building with his gun drawn but did not see the suspect. (Tr. Vol. II at 281.)  A pond surrounded by tall marsh grass was located behind the apartment building, and Sgt. Hurst suspected the man was in the marsh.  Sgt. Hurst aired over the police radio that a person matching a description of the suspect was on the run in the area near the pond.  The CPD helicopter and canine unit began focusing their search on the area near the pond.

{¶ 11} Officer Aaron Heflin and his canine partner Officer Vando began searching in the marsh at 2:27 p.m. Deputy James Coburn assisted Officers Heflin and Vando in their search. Officer Heflin noted the marsh grass was "thick" and "taller than [his] head" in spots. (Tr. Vol. II at 310.) After searching for some time, Officer Heflin commanded Officer Vando to stop his search, as they were "getting towards where we were about to walk out." (Tr. Vol. II at 310.) Deputy Coburn then spotted the suspect lying in the marsh grass a few feet away from the edge of the pond. At 2:56 p.m., Officer Heflin aired over the police radio that they had found the suspect.

{¶ 12} The suspect was wearing a white T-shirt when Deputy Coburn found him in the marsh. When the suspect stood up, Officer Heflin "noticed there was some clothing under the suspect balled up." (Tr. Vol. II at 312.) Officer Heflin grabbed the clothes and carried them out of the marsh. The clothing items Officer Heflin discovered underneath the suspect consisted of a black hoodie with a white Under Armor symbol on it, a toboggan hat, and a glove.

{¶ 13} When Deputy Coburn brought the suspect out of the marsh, Sgt. Hurst "[i]mmediately" recognized the man as the "[s]ame person that ran from [him]." (Tr. Vol. II at 289.) Sgt. Hurst noted the man had changed his clothing, as he had on "a white T-shirt the second time." (Tr. Vol. II at 290.) When Officer Heflin brought the clothes out from the marsh, Sgt. Hurst recognized the black hoodie as the "same one that [the suspect] was wearing when he took off running." (Tr. Vol. II at 290.)

{¶ 14} Medics transported Black and Mora from the apartment to the hospital. Holloway was pronounced dead at the scene. Black succumbed to his injuries and died shortly after arriving at the hospital. The official cause of death for both Black and Holloway was a gunshot wound to the head. Mora was shot four times but sustained only grazing wounds. Mora explained she was "pretty much head-to-toe casted up" while in the hospital following the incident. (Tr. Vol. II at 216.)

{¶ 15} At approximately 4:30 p.m. on October 24, 2017, CPD Detective ("Det.") Aaron Mall interviewed Mora at the hospital and presented her with a photo array. When Det. Mall initially presented Mora with the photo array, Mora stated she did not recognize any of the photographs. As Det. Mall was preparing to leave, he asked Mora if there was anything else "important [she] need[ed] to tell him." (Tr. Vol. II at 219.) Mora then informed Det. Mall that it was "possible" the number six photograph "could be the person,"

if there were "some adjustments, being a hoodie, a little more bushier facial [hair]." (Tr. Vol. II at 219.)  Appellant's photo was the number six photograph in the array.

{¶ 16} CPD crime scene search unit processed the scene at 4026 Alwood Lane through the evening of October 24, 2017.  The search unit took numerous photographs and recovered four spent bullets and four shell casings from inside the apartment.  The search unit also took several samples from the scene for DNA testing.

{¶ 17} The following day, October 25, 2017, the CPD dive team searched the pond in the Winchester Park apartment complex for evidence.  The lead detective on the case "walked the area" with the dive team and told them "where they wanted searched." (Tr. Vol. II at 359.)  A dive team member discovered a Glock firearm in the pond approximately 14 yards out from the shoreline.

{¶ 18} Kelby Ducat, an employee of the Columbus Police Crime Laboratory firearms and identifications unit, performed ballistics testing on the Glock firearm recovered from the pond and the four shell casings and four spent projectiles recovered from Black's apartment.  Ducat testified regarding the firearms identification process, and stated it was his opinion, within a reasonable degree of scientific certainty, that the four shell casings and three of the spent projectiles discovered in the apartment were fired from the Glock firearm. Ducat was unable to reach any conclusion regarding the remaining spent projectile, as the surface of the bullet was damaged and therefore could not be tested.

{¶ 19} Donna Schwesinger, a forensic scientist employed by the Ohio Bureau of Criminal Identification and Investigation, performed gunshot residue analysis in the case. Schwesinger explained that whenever a firearm is fired, a vaporous cloud consisting of tiny particles containing lead, barium, and antimony is expelled from the firearm.  As the cloud cools, the tiny particles settle on anything nearby, leaving a microscopic residue known as gunshot residue. Schwesinger's testing revealed "[a] particle" of gunshot residue "on the right cuff" of the black hoodie and "eight particles" of gunshot residue on the glove, which were both discovered balled up underneath appellant at the time of his apprehension. (Tr. Vol. III at 449-50.)  Although Schwesinger also tested the toboggan hat and swabs taken from appellant's hands at the time of his arrest, Schwesinger did not discover any gunshot residue on the hat or appellant's hands.

{¶ 20} Hope Olson, a Columbus Police Crime Laboratory forensic scientist with a specialty in DNA analysis, conducted DNA testing on various items collected in the case.

Olson explained that DNA, which is present in every cell of a person's body, is the "chemical blueprint that makes [each person] unique." (Tr. Vol. III at 510.) Olson stated the DNA analysis process involved extracting DNA from cells, quantifying the amount of DNA, amplifying the DNA, and creating a DNA profile which could then be compared to a known sample.

{¶ 21} Olson tested samples taken from the grip and the slide of the Glock firearm, as well as the live rounds found inside the Glock firearm, but stated the DNA from these samples was not of sufficient quantity to complete the DNA testing process. Olson tested samples taken from the inner collar and cuff of the black hoodie, but the results were inconclusive, as "no comparisons [could] be drawn from a known reference standard." (Tr. Vol. III at 542.) Olson tested swabs the crime scene search unit took from locations in Black's apartment, but the swabs all contained an insufficient quantity of DNA.

{¶ 22} Olson also tested the glove and toboggan hat which were discovered balled up underneath appellant in the marsh. Olson's testing revealed a DNA profile of two different people on the glove, and Olson determined that appellant could not be excluded as the major contributor to the DNA on the glove. Olson quantified her finding, explaining it was "121 sextillion times more likely if [appellant was] one of the contributors [to the DNA on the glove] than if this were a mixture of two unknown unrelated individuals." (Tr. Vol. III at 545.) Similarly, Olson's testing of the toboggan hat revealed a mixture of two DNA profiles, and Olson concluded appellant could not be excluded as a major contributor to the DNA inside the hat. Olson quantified this result, explaining it was "at least 66 quadrillion times more likely if [appellant was] one of the contributors than if this were a mixture of two unknown unrelated individuals." (Tr. Vol. III at 549.)

{¶ 23} On September 9, 2020, appellant filed a motion to suppress Mora's identification of him from the photo array. Appellant argued the identification was inadmissible because Det. Mall failed to follow R.C. 2933.83 and certain CPD policies when administering the photo array. Appellant supplemented his motion to suppress on October 6, 2020. The state responded to appellant's initial and supplemental motions to suppress on October 15, 2020.

{¶ 24} On November 30, 2020, the trial court held a hearing on appellant's motion to suppress. Det. Mall was the only witness to testify at the hearing. The trial court denied the motion to suppress at the conclusion of the hearing.

{¶ 25} A jury trial commenced on the charges on September 20, 2021. Mora identified appellant at trial as the neighbor/friend she saw in Black's apartment on October 24, 2017. At the conclusion of trial, the jury returned verdicts finding appellant guilty of all counts and specifications charged in the indictment.

{¶ 26} On October 26, 2021, the trial court held a sentencing hearing. The court merged Counts 1 and 2; Counts 3 and 4; and Counts 5 and 6 for purposes of sentencing. The state elected to proceed to sentencing on Count 1, the purposeful murder of Black; Count 3, the purposeful murder of Holloway; and Count 5, the attempted purposeful murder of Mora. The court also sentenced appellant on Count 7, the tampering with evidence charge. The court sentenced appellant to a prison term of 15 years to life on both Counts 1 and 3, to be served consecutive to each other; 11 years on Count 5, to be served consecutive to Counts 1 and 3; 9 months on Count 7, to be served concurrently with the other sentences, and an additional consecutive 36-month period of mandatory incarceration for the firearm specifications on Counts 1 and 3. On October 28, 2021, the trial court issued a judgment entry memorializing appellant's convictions and sentence.

## II. Assignments of Error

{¶ 27} Appellant appeals and assigns the following seven assignments of error for our review:

> [I.] THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS AN EYEWITNESS PHOTO ARRAY IDENTIFICATION.
>
> [II.] THE TRIAL COURT ERRED IN LIMITING DEFENSE COUNSEL'S CLOSING ARGUMENT REGARDING THE EYEWITNESS PHOTO ARRAY IDENTIFICATION, DEPRIVING APPELLANT OF DUE PROCESS AND A FAIR TRIAL.
>
> [III.] THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY REGARDING THE FAILURE TO COMPLY WITH THE PROCEDURES FOR CONDUCTING THE EYEWITNESS PHOTO ARRAY IDENTIFICATION.
>
> [IV.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ADMITTING HEARSAY EVIDENCE OF A SEARCH WARRANT WHICH DESTROYED THE PRESUMPTION OF INNOCENCE.

[V.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN INSTRUCTING THE JURY ON CONSCIOUSNESS OF GUILT DEPRIVING APPELLANT OF DUE PROCESS AND A FAIR TRIAL.

[VI.] APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

[VII.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

For ease of analysis, we address appellant's assignments of error out of order.

### III. First Assignment of Error – Motion to Suppress

{¶ 28} In his first assignment of error, appellant asserts the trial court erred by overruling his motion to suppress the identification testimony. Appellant contends the court should have suppressed Mora's identification of him from the photo array because Det. Mall presented the photo array to Mora in a manner which was unnecessarily suggestive of appellant's guilt. Appellant contends the presentation of the photo array was unnecessarily suggestive in the following ways: (1) Det. Mall conducted a pre-view consultation with Mora in violation of CPD policy, (2) Det. Mall implicitly assured Mora the suspect's photo was in the array, and (3) Det. Mall failed to comply with R.C. 2933.83(B)(4).

{¶ 29} Appellate review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 32, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. In evaluating a motion to suppress, the trial court acts as the finder of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *Burnside* at ¶ 8. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id. See State v. Johnson*, 10th Dist.

No. 13AP-637, 2014-Ohio-671, ¶ 6 (holding that appellate courts "apply a de novo standard in determining whether the trial court properly denied appellant's motion to suppress").

{¶ 30} "When a witness has been confronted with a suspect before trial, due process requires a court to suppress [the witness's] identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances." *State v. Waddy*, 63 Ohio St.3d 424, 438 (1992), citing *Neil v. Biggers*, 409 U.S. 188 (1972). *See Simmons v. United States*, 390 U.S. 377, 384 (1968) (stating that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"). " 'The rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state.' " *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 19, quoting *State v. Brown*, 38 Ohio St.3d 305, 310 (1988).

{¶ 31} In determining the admissibility of challenged identification testimony, courts apply a two-prong test: (1) did the defendant demonstrate that the identification procedure was unnecessarily suggestive, and, if so, (2) whether the identification, viewed under the totality of the circumstances, was reliable. *Waddy* at 439; *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, ¶ 38 (10th Dist.); *State v. Harris*, 2d Dist. No. 19796, 2004-Ohio-3570, ¶ 19. Thus, even if police use an unnecessarily suggestive identification procedure, exclusion is appropriate only when the improper police conduct creates a " 'substantial likelihood of misidentification.' " *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012), quoting *Neil* at 201. "[R]eliability [of the eyewitness identification] is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). "It is the defendant's burden to prove that the procedures utilized were both suggestive and unnecessary and that the testimony was or will be unreliable based upon the totality of the circumstances test." *Monford* at ¶ 41.

{¶ 32} A lineup is unnecessarily suggestive "if it steers the witness to one suspect, independent of the witness's honest recollection." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 208, citing *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir.2001). *See State v. Reddy*, 10th Dist. No. 09AP-868, 2010-Ohio-3892, ¶ 32, citing *State v. Merriman*, 10th Dist. No. 04AP-463, 2005-Ohio-3376, ¶ 17 (stating that whether "an identification was

suggestive depends on factors such as the size of the array, the manner in which the array is presented, and the contents of the array"); *State v. E.T.*, 10th Dist. No. 17AP-828, 2019-Ohio-1204, ¶ 48, quoting *Perry* at 232 (stating that an identification procedure may be unnecessarily suggestive if the procedure was " 'infected by improper police influence' resulting in a 'corrupting effect' on the identification process").  In assessing the reliability of the identification under the totality of the circumstances, the factors to consider are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation.  *State v. Broom*, 40 Ohio St.3d 277, 284 (1988); *Waddy* at 439, citing *Neil* at 199-200.

{¶ 33} If the defendant fails to establish that the identification procedure was unnecessarily suggestive under the first prong of the test, a court need not address the reliability factors under the second prong of the test.  *Monford* at ¶ 41.  *Accord State v. Jackson*, 4th Dist. No. 11CA20, 2012-Ohio-6276, ¶ 28, quoting *State v. Lewis*, 2d Dist. No. 24271, 2011-Ohio-5967, ¶ 30 (holding that, as the court had not found the photo lineup "unnecessarily suggestive," it " 'need not address the second prong of the identification-testimony test (the reliability prong)' "); *State v. Green*, 117 Ohio App.3d 644, 653 (1st Dist.1996).  If the identification procedure was not unduly suggestive, "any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required."  *Reddy* at ¶ 31, citing *State v. Wills*, 120 Ohio App.3d 320, 325 (8th Dist.1997).  *Accord State v. Vaughn*, 2d Dist. No. 28409, 2020-Ohio-307, ¶ 13.

{¶ 34} R.C. 2933.83 requires any law enforcement agency or criminal justice entity that conducts live or photo lineups to "adopt specific procedures for conducting the lineups." R.C. 2933.83(B).  Such procedures, at a minimum, must include the use of a blind or blinded administrator. R.C. 2933.83(B)(1).  *See State v. Montgomery*, 10th Dist. No. 13AP-512, 2014-Ohio-4354, ¶ 40, fn. 3, quoting *State v. Howard*, 8th Dist. No. 100094, 2014-Ohio-2176, ¶ 18 (noting that the purpose of R.C. 2933.83 is to "prevent the use of 'unnecessarily suggestive procedures' ").

{¶ 35} An administrator is the person who conducts a live or photo lineup.  R.C. 2933.83(A)(1).  A "[b]lind administrator" is an administrator who "does not know the

identity of the suspect." R.C. 2933.83(A)(2). A "[b]linded administrator" is an administrator who "may know who the suspect is, but does not know which lineup member is being viewed by the eyewitness." R.C. 2933.83(A)(3).[1] The administrator of the photo lineup must make a written record that includes the following information:

> (a) All identification and nonidentification results obtained during the lineup, signed by the eyewitnesses, including the eyewitnesses' confidence statements made immediately at the time of the identification;
>
> (b) The names of all persons present at the lineup;
>
> (c) The date and time of the lineup;
>
> (d) Any eyewitness identification of one or more fillers in the lineup;
>
> (e) The names of the lineup members and other relevant identifying information, and the sources of all photographs or persons used in the lineup.

R.C. 2933.83(B)(4).

{¶ 36} Evidence of a failure to comply with R.C. 2933.83(B) or "with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to [R.C. 2933.83(B)] shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." R.C. 2933.83(C)(1). If noncompliance with R.C. 2933.83 is demonstrated, evidence of such noncompliance is "admissible in support of any claim of eyewitness misidentification resulting from or related to the lineup as long as that evidence otherwise is admissible." R.C. 2933.83(C)(2).

---

[1] The R.C. 2933.83 definitions for both blind and blinded administrator also state that the terms "include[] an administrator who conducts a photo lineup through the use of a folder system or a substantially similar system." R.C. 2933.83(A)(2) and (3). The "[f]older system" is a method for conducting a photo lineup where the photograph "that resembles the description of the suspected perpetrator of the offense" and five "filler photographs" are placed in separate folders and shuffled "so that the administrator is unaware of which folder contains the 'suspect photograph.' " R.C. 2933.83(A)(6)(a) and (c). Although R.C. 2933.83 describes the folder system, the statute does not require use of the folder system. As such, the failure to use the folder system does not, on its own, render an identification procedure unnecessarily suggestive. *State v. Wells*, 8th Dist. No. 98388, 2013-Ohio-3722, ¶ 77 (noting that R.C. 2933.83 "does not require the use of the 'folder system'; rather the 'folder system' is one system that can be used by law enforcement for photo lineups"); *E.T.* at ¶ 57, quoting *Monford* at ¶ 51 (noting that the failure to present the photo array using " 'sequential methods does not make the identification procedure unduly suggestive' "); *State v. Harmon*, 2d Dist. No. 26883, 2017-Ohio-8106, ¶ 24.

{¶ 37} While "R.C. 2933.83(C)(1) requires a court to consider evidence of a failure to comply with the requirements detailed in R.C. 2933.83(B), it does not mandate suppression for such a failure." *E.T.*, 2019-Ohio-1204, at ¶ 52, citing *State v. Young*, 10th Dist. No. 15AP-1144, 2017-Ohio-9028, ¶ 35. *Accord State v. Sails*, 2d Dist. No. 24733, 2012-Ohio-4453, ¶ 30 (stating that R.C. 2933.83(C)(1) does not, however, "provide an independent basis upon which to suppress evidence, and a trial court errs in solely relying on the statute in suppressing an identification"); *Jackson* at ¶ 25; *State v. Ruff*, 1st Dist. No. C-110250, 2012-Ohio-1910, ¶ 7. Thus, "[t]he failure to strictly comply with R.C. 2933.83 does not render the pretrial identification procedure per se impermissibly suggestive," but "[r]ather, all facts and circumstances must be considered." *Young* at ¶ 35.

{¶ 38} As required by R.C. 2933.83(B), the CPD has adopted specific procedures for conducting live and photo lineups, which are contained in the CPD Training Supplement. (Nov. 30, 2020 Tr., State's Ex. A ("Training Supplement").) The Training Supplement instructs officers that an "important aspect of any photo *lineup* or show-up is the independent, uninfluenced identification of the suspect by a victim or witness." (Emphasis sic.) (Training Supplement at I.) The Training Supplement provides that, unless impractical, a blind or blinded administrator shall conduct a photo lineup, and defines a blind administrator as "[a]n administrator who does not know the identity of the suspect." (Training Supplement at II(B).) Under a section titled "Avoid Suggestion and/or Feedback," the Training Supplement instructs officers that there "shall be no pre-view consultation with the victim and/or witness. Do not be suggestive regarding *a* suspect's photo." (Emphasis sic.) (Training Supplement at III(A)(1).)

{¶ 39} Det. Mall testified at the suppression hearing, explaining he had administered hundreds of photo arrays throughout his 25-year employment with CPD. Det. Mall stated his only involvement with the present case was interviewing Mora at the hospital and presenting her with the photo array. Det. Mall did not create the photo array. Det. Mall explained he was a blind administrator in this case because he "had no knowledge of who the possible suspect was in the incident." (Nov. 30, 2020 Tr. at 12.)

{¶ 40} When Det. Mall entered Mora's hospital room, he observed Mora lying "flat on her back with some medical apparatus on her which restricted her movement somewhat." (Nov. 30, 2020 Tr. at 13.) Det. Mall obtained biographical information from

Mora and conducted an interview with her about the incident. Det. Mall then provided Mora with the photo array instructions and presented her with the photo array at 4:43 p.m.

{¶ 41} Det. Mall identified State's exhibit B-1 as the blind administrator photo array procedure form ("photo array form") he utilized in the case. Det. Mall also identified State's exhibit D as the audio recording he made of his hospital interview with Mora. The state played the following portion of the audio recording during the suppression hearing, which documented Det. Mall reading the photo array form instructions to Mora and presenting her with the array:

> DET. MALL: So I want to read some instructions to you, okay? The photo lineup you are about to view consists of six photographs in no particular order of importance. The subject of this investigation may or may not be included in the photographs and it is just as important to clear an innocent person from suspicion as it is to identify a guilty party.
>
> * * *
>
> An individual's appearance may easily change, for example, getting a hair cut, shaving or facial hair. Therefore, an individual's appearance in the photograph may differ from the day of the incident.
>
> I do not know who the suspect of this investigation is. Look carefully at the photographs of all six people and advise me as to whether or not you recognize anyone. You are not required to select any of the photographs, and the police will continue to investigate the incident regardless of whether an identification is made.
>
> Do you understand those instructions I read to you?
>
> MS. MORA: Yeah, but why, why would you guys have pictures today of him?
>
> DET. MALL: Well, based on information that the primary detective got from officers at [the] scene, they were able to put some things together, so -- you are okay, though, with all of the instructions I read to you?
>
> MS. MORA: Uh-huh.
>
> DET. MALL: All right. Let me show you this photo array here. There is a number below each photograph. So if you do recognize a photograph, if you would refer to it by number.

MS. MORA: Huh-uh.

DET. MALL: No, you don't recognize anyone?

MS. MORA: Huh-uh.

(Nov. 30, 2020 Tr. at 30-32.)

{¶ 42} Det. Mall explained that, when Mora indicated she did not recognize anyone in the photo array, he "put the photo array back into [his] folder." (Nov. 30, 2020 Tr. at 18.) The state played the following portion of the audio recording at the suppression hearing, which documented the conversation between Det. Mall and Mora after Det. Mall put the photo array away:

> DET. MALL: Okay. Is there anything else that I haven't asked you about or talked to you about that you think would be important for us to know?
>
> MS. MORA: The only thing is, like, I'm thinking now that the one picture is similar. I don't want to, like, make any innocent person a victim at all or a suspect.
>
> DET. MALL: No, I understand.
>
> MS. MORA: But the face is round. Like if he had more hair on his face like people are growing.
>
> DET. MALL: Which photo are you referring to?
>
> MS. MORA: This one.
>
> * * *
>
> This one, 6, I think.
>
> DET. MALL: No. 6?
>
> MS. MORA: If he had on like a hoodie, probably, but I don't know him at all.

(Nov. 30, 2020 Tr. at 33-34.)

{¶ 43} Det. Mall had Mora circle the number six and place her initials next to the number six photograph on the array. Det. Mall noted that Mora's "handwriting was shaky" as she wrote her initials. (Nov. 30, 2020 Tr. at 20.) After watching Mora's difficulty writing her initials, Det. Mall decided "that she was not going to be able to, you know, write a full

sentence." (Nov. 30, 2020 Tr. at 20.) Det. Mall did not have Mora write a statement or sign the photo array form "[d]ue to the position that she was laying in" and because she had on a "neck brace * * * and was not mobile." (Nov. 30, 2020 Tr. at 19-20.)

{¶ 44} Det. Mall wrote "unable to complete" next to the section titled "Viewer's Statement" on the photo array form, and wrote "unable to sign" next to the section titled "Viewer's Signature." (State's Ex. B1.) Under the section titled "Administrator's Comments," Det. Mall wrote the following: "Viewed the array – did not recognize anyone initially. I put the array away, Ms. Mora stated 'the one' photo is similar to the suspect. I brought the array back out, she then identified #6 saying if he had bushier facial hair and a hoodie on its 'probably' the suspect." (State's Ex. B-2.)

{¶ 45} The trial court denied the motion to suppress at the conclusion of the hearing. The court stated it found "Detective Mall to be extremely credible," that Det. Mall was a blind administrator, and he "fully complied with the statute in this matter and how they conducted the interview." (Nov. 30, 2020 Tr. at 71.) The court stated it did not "believe that it was an unconstitutional photo array" and that Mora's identification "was [not] influenced." (Nov. 30, 2020 Tr. at 72.)

{¶ 46} Appellant does not contend that the actual photo array was unnecessarily suggestive of his guilt. We have reviewed the photo array, and note that the array contains six photographs on a single page depicting six African-American males of similar age with similar facial features, including facial hair. We find nothing unnecessarily suggestive about the photo array itself.

{¶ 47} Rather, appellant contends that the manner in which Det. Mall presented the photo array was unnecessarily suggestive. Appellant notes that Det. Mall questioned Mora about the facts of the incident for 13 minutes before presenting her with the photo array. Appellant contends Det. Mall's interview with Mora prior to showing her the array constituted a "pre-view consultation" prohibited by the Training Supplement at III(A)(1).

{¶ 48} At the suppression hearing, Det. Mall explained that the pre-view consultation prohibited by the Training Supplement meant he "should not have any conversation or allow the witness to view the photo array or have any comments or conversation with them about that photo array prior to reading the instructions and showing them the array." (Nov. 30, 2020 Tr. at 55.) Det. Mall stated the prohibition against pre-view consultations did not prevent him from discussing the underlying incident with

the witness before administering the photo array. As such, Det. Mall stated he did not conduct a pre-view consultation with Mora because he simply "conduct[ed] an interview with her concerning the facts of the incident" and "did not pre-view the photo array or consult with her about the photo array prior, at any point in that interview prior to providing the photo array information to her." (Nov. 30, 2020 Tr. at 46-47.) The court concluded the prohibition against a pre-view consultation in the Training Supplement did not prevent Det. Mall from gathering "background information from [Mora], addresses and what she saw, what she heard." (Nov. 30, 2020 Tr. at 71.) The court concluded Det. Mall had not conducted a pre-view consultation with Mora.

{¶ 49} Appellant contends Det. Mall's initial 13-minute interview with Mora was a pre-view consultation prohibited by the Training Supplement at III(A)(1). However, appellant fails to direct this court to any facts in the record or legal authority to support his contention. The record from the suppression hearing contains only Det. Mall's testimony explaining his understanding of a pre-view consultation. The trial court found Det. Mall to be extremely credible, a finding we are bound to accept. *Burnside*, 2003-Ohio-5372, at ¶ 8.

{¶ 50} As appellant fails to demonstrate that Det. Mall's understanding of a pre-view consultation was incorrect,[2] we accept the trial court's factual findings and find that the Training Supplement's prohibition against a pre-view consultation prevented Det. Mall from discussing the photo array with Mora before reading her the instructions and administering the array. However, the prohibition against a pre-view consultation did not prohibit Det. Mall from interviewing Mora regarding the facts of the underlying incident. Appellant does not contend that Det. Mall discussed the photo array with Mora during the initial 13-minute interview, and Det. Mall's testimony demonstrates he did not discuss the

---

[2] This court's independent research has also not produced any case addressing the meaning of a "pre-view consultation." However, we note at least one case where the facts demonstrate the detectives discussed the incident with the witness before administering the photo array and, although the significance of that interview was not at issue in the case, this court found nothing unnecessarily suggestive about the presentation of the photo array. *See E.T.*, 2019-Ohio-1204, at ¶ 16, 61 (noting that "[b]efore viewing the photo array, [the witness] spoke with the detective about the incident," and finding that the identification procedure was not "unnecessarily suggestive").

photo array during the initial interview.[3]  Accordingly, based on the facts of this case, the trial court properly determined that Det. Mall's interview with Mora did not constitute a "pre-view consultation" pursuant to the Training Supplement at III(A)(1).

{¶ 51} Appellant also asserts the definitions of blind and blinded administrator in R.C. 2933.83 demonstrate the "General Assembly's intent that the administrator of the photo lineup not be an investigating detective." (Appellant's Brief at 18.) We disagree. The statute provides specific definitions for the terms blind and blinded administrator, and the definitions do not address the administrator's role in the investigation.  R.C. 2933.83(A)(2) and (3).  Had the General Assembly intended to prohibit an officer who performed an investigative role in the investigation from being a blind or blinded administrator, we presume the General Assembly would have placed language in the statute to such effect. *See Gabbard v. Madison Local School Dist. Bd. of Edn.*, 165 Ohio St.3d 390, 2021-Ohio-2067, ¶ 13 (stating that a court's "paramount concern in examining a statute is the legislature's intent in enacting the statute," and that courts must "give effect to the words the General Assembly has chosen, and * * * neither add to nor delete from the statutory language"); *State ex rel. Lee v. Karnes, Franklin Cty. Sheriff*, 103 Ohio St.3d 559, 2004-Ohio-5718, ¶ 27.  The trial court properly found Det. Mall to be a blind administrator because he did not know the identity of the suspect.

{¶ 52} Appellant next contends Det. Mall's response to Mora's question "implicitly assured Mora of the suspect's presence in the array."  (Appellant's Brief at 2.)  As noted above, after Det. Mall read the photo array instructions to Mora, Mora asked, "but why, why would you guys have pictures today of him?"  (Nov. 30, 2020 Tr. at 32.)  Det. Mall responded stating, "[w]ell, based on information that the primary detective got from

---

[3] While the state admitted the audio recording of Det. Mall's hospital interview with Mora at the suppression hearing, the record does not contain a transcript of the audio recording. *See* App.R. 9(B)(1) and (3) (providing, in relevant part, that "it is the obligation of the appellant to ensure that the proceedings the appellant considers necessary for inclusion in the record, however those proceedings were recorded, are transcribed in a form that meets the specifications of App.R. 9(B)(6)," and that the "appellant shall order the transcript in writing and shall file a copy of the transcript order with the clerk of the trial court"); *A.R.C. v. D.J.S.*, 10th Dist. No. 19AP-807, 2020-Ohio-5403, ¶ 14, quoting *State v. Tinley*, 9th Dist. No. 17CA0062-M, 2018-Ohio-2239, ¶ 6 (stating that the " '[t]ranscription of any necessary proceedings is, therefore, required, and an appellant may not rely solely on an audio-recording for purposes of his or her appeal' "). Although the state played certain portions of the tape at the suppression hearing, neither party played the initial 13-minute interview portion of the recording. However, having listened to State's exhibit D, we generally confirm that Det. Mall's description of his interview with Mora was accurate and he did not make any statements regarding the photo array during the initial interview.

officers at [the] scene, they were able to put some things together." (Nov. 30, 2020 Tr. at 32.)

{¶ 53} Appellant initially notes that, at trial, CPD Det. Arthur Hughes testified he would not have answered Mora's question as Det. Mall did.[4] However, Det. Hughes did not testify at the suppression hearing. When reviewing a trial court's ruling on a motion to suppress, "an appellate court may only consider evidence that was presented during the suppression hearing, and may not consider evidence presented at trial." *Monford*, 2010-Ohio-4732, at ¶ 45. Moreover, the fact that Det. Hughes would not have answered Mora's question in the same way Det. Mall did does not, on its own, demonstrate that Det. Mall's response rendered the photo array unnecessarily suggestive.

{¶ 54} This court has observed that "[i]n most photo array situations, the victim of a crime knows someone in the array is a likely suspect, otherwise the police would not be asking them to look at photos." *State v. Woodfork*, 10th Dist. No. 14AP-88, 2014-Ohio-3608, ¶ 20. Indeed, "even without communication from a police officer, every witness assumes that the officer has included in the array someone whom the officer believes might be the perpetrator of the crime." *State v. Beougher*, 10th Dist. No. 93APA11-1622 (June 14, 1994). Appellate courts have reached differing conclusions regarding whether an officer's statement informing a witness that a suspect's photograph is in the array renders the photo array unnecessarily suggestive. *Compare State v. Jones*, 8th Dist. No. 85025, 2005-Ohio-2620, ¶ 16-17 (finding the detective's statement advising the witness "that the suspect's photo was in the array" rendered "the identification procedure unduly suggestive," as the witness "knew that she had to choose one of the men in the photo array, regardless of certainty"); *State v. Johnstone*, 8th Dist. No. 92885, 2010-Ohio-1854, ¶ 25; *with State v. Bandy*, 11th Dist. No. 2007-L-089, 2008-Ohio-1494, ¶ 48, quoting *State v. Starks*, 6th Dist. No. L-05-1417, 2007-Ohio-4897, ¶ 33 (holding that " '[a] police statement that the picture of a suspect was among those in the array [i]s not impermissibly suggestive[, as it] seems not unreasonable for a witness to assume that any time police show a photo array, one of the pictures there is of an individual of police interest' "); *State v. Gloss*, 5th Dist. No. 2009

---

[4] Defense counsel asked Det. Hughes if it would be "inappropriate" for an officer administering a photo array to "say[] something in answer to a question or a person that's viewing the photo array, about how did you find that picture so soon and he tells that person that there was an officer in charge of the scene that gathered information making that possible." (Tr. Vol. III at 498.) Det. Hughes responded stating, "Yeah. It's something I wouldn't have done." (Tr. Vol. III at 498.)

CA 00213, 2010-Ohio-4059, ¶ 58, quoting *Bandy* at ¶ 48 (finding the fact the officer informed the witness "the suspect was included in the array" did not, "in and of itself, make the procedure unduly suggestive," as " '[c]ommon sense should tell the person looking at the array that the police have a possible suspect included in the array' "); *State v. Patterson*, 5th Dist. No. 2009CA00142, 2010-Ohio-2988, ¶ 59, 63.

{¶ 55} Considering the facts and circumstances of this case, we find Det. Mall's response to Mora's question did not render the photo array unnecessarily suggestive of appellant's guilt. Immediately before Mora asked the question, Det. Mall informed Mora that "[t]he subject of this investigation may or may not be included in the photographs," that she was "not required to select any of the photographs," and that he did "not know who the suspect of this investigation [was]." (Nov. 30, 2020 Tr. at 31.) Det. Mall's response to Mora's question did not directly inform Mora that the suspect's photo was included in the array, as the response merely indicated that officers created the array based on information gathered at the scene. The response thus permitted the conclusion that officers created the array using the description of the suspect Mora had provided at the scene. The response also did not inform Mora that a suspect had been apprehended or taken into custody. *Compare State v. Brown*, 10th Dist. No. 88AP-1003 (Apr. 18, 1989) (stating that "to tell the victim that the police ha[d] a suspect is not to say the assailant is in the array, but only that he might be," and the "mere fact that the police presented the victim with the array to examine implies the same conclusion"). While appellant contends Det. Mall's statement implicitly assured Mora the suspect's photo was in the array, this court has previously held that, even absent communication from an officer, witnesses generally assume police have included a photograph of the likely suspect in the array.[5] *Woodfork* at ¶ 20; *Beougher*.

{¶ 56} Det. Mall's response to Mora's question also did not steer Mora toward any particular photograph in the six-person photo array. *See Adams*, 2015-Ohio-3954, at ¶ 208 (stating that a lineup procedure is unnecessarily suggestive when it "steers the witness to one suspect"); *Foster v. California*, 394 U.S. 440, 443 (1969) (finding an identification unduly suggestive, as police "made it all but inevitable that [the witness] would identify [the

---

[5] Although Mora's trial testimony is irrelevant to our review of the motion to suppress, at trial Mora did testify that Det. Mall's response to her question did not lead her to believe that one of the photos in the array would be the suspect's photograph. Mora explained that, even after Det. Mall's response to her question, she was only "expecting to look for somebody that [she] recall[ed] seeing" and "didn't expect him to be on there." (Tr. Vol. II at 235.)

defendant]"). As Det. Mall's response to Mora's question did not make it any more likely that Mora would select appellant's photograph over one of the other photographs, appellant fails to demonstrate that the response rendered the identification procedure unnecessarily suggestive of his guilt. *See Woodfork* at ¶ 19 (noting that, although the officer's statement informing the victim they "had a DNA match might well have led the victim to conclude that the person police believed was the burglar had his photo in the array," the statement "by itself [did] not convey which of the six photos was the 'correct' photo from a police standpoint"); *Beougher* (finding the officer's statement "that a person was in custody" did not "suggest[] to any of the witnesses which photograph to select from the six-photograph array," and therefore did not render the identification procedure "so suggestive as to give rise to a substantial likelihood of irreparable misidentification").

{¶ 57} Appellant further notes that, after Mora initially failed to identify anyone from the photo array, Det. Mall "continued to question Mora, as if he wanted Mora to reconsider and still make an identification." (Appellant's Brief at 19.) After Mora indicated she did not recognize anyone, Det. Mall put the photo array away and asked her, "[i]s there anything else that I haven't asked you about or talked to you about that you think would be important for us to know?" (Nov. 30, 2020 Tr. at 33.) Det. Mall's question was open-ended and did not direct Mora back to the photo array. Rather, Mora then directed Det. Mall back to the photo array. *Compare State v. Hill*, 8th Dist. No. 101755, 2015-Ohio-1456, ¶ 28, citing *State v. Reed*, 9th Dist. No. 12CA0051, 2013-Ohio-3970, ¶ 51 (stating that "[a] second viewing [of the photo array] by a victim witness, by itself, does not constitute a violation of the procedures put in place pursuant to R.C. 2933.83"); R.C. 2933.83(A)(6)(h). Det. Mall's final, open-ended question to Mora did not render the presentation of the photo array unnecessarily suggestive.

{¶ 58} Appellant lastly contends that Det. Mall violated R.C. 2933.83(B)(4)(a) as he failed to record Mora's confidence in the identification or have Mora sign the photo array form. However, Det. Mall did record Mora's confidence statement, as he wrote on the photo array form that Mora "identified #6 saying if he had bushier facial hair and a hoodie on its 'probably' the suspect." (State's Ex. B-1.) Appellant contends this statement was insufficient because Det. Mall only recorded Mora's statement that the photo was "probably" the suspect. (Appellant's Brief at 20.) R.C. 2933.83 directs the administrator to record the witness's confidence statements "made immediately at the time of the

identification."  R.C. 2933.83(B)(4)(a).  The Training Supplement specifically directs the administrator to not "***ask the witness 'How sure are you?' to solicit a confidence level***," and to instead "***record any unsolicited, specified level of confidence***." (Emphasis sic.) (Training Supplement at IV(C)(3)(g)(1).)  Thus, Det. Mall complied with the statute and the Training Supplement by not soliciting a specific confidence level from Mora, and instead recording Mora's unsolicited confidence statement made at the time of her identification.

{¶ 59}  Although Mora initialed the photo array, she did not sign the photo array form. *See* R.C. 2933.83(B)(4)(a) (stating that "[a]ll identification and nonidentification results obtained during the lineup," including the witnesses "confidence statements," must be "signed by the eyewitnesses").  The trial court concluded that Mora's failure to sign the photo array form while she was "in the emergency room on medication, in restraints, [and a] neck brace," did not amount to a material violation of R.C. 2933.83.  (Nov. 30, 2020 Tr. at 71.)  We find the trial court's ruling reasonable under the facts of the present case.

{¶ 60}  Moreover, even if Mora's failure to sign the photo array form failed to strictly comply with the requirements of R.C. 2933.83, "[t]he failure to strictly comply with R.C. 2933.83 does not render the pretrial identification procedure per se impermissibly suggestive." *Young*, 2017-Ohio-9028, at ¶ 35.  "Rather, all facts and circumstances must be considered."  *Id.* Considering the totality of the facts and circumstances in the case, including Det. Mall's testimony explaining why he did not have Mora sign the form and the fact that Mora initialed the photo array, Mora's failure to sign the photo array form in the present case did not render the identification procedure so unnecessarily suggestive as to give rise to a substantial likelihood of misidentification.  *See State v. Dewberry*, 2d Dist. No. 27434, 2020-Ohio-691, ¶ 77; *State v. Jones*, 8th Dist. No. 102318, 2015-Ohio-4694, ¶ 57-58.

{¶ 61}  Accordingly, appellant fails to demonstrate that the identification procedure utilized in the present case was unnecessarily suggestive.  As such, we need not address the reliability of the identification under the totality of the circumstances. *Monford*, 2010-Ohio-4732, at ¶ 41.  Rather, the issues appellant presents regarding the reliability of Mora's identification go to the weight of the identification, not its admissibility. *Reddy*, 2010-Ohio-3892, at ¶ 31.

{¶ 62} Based on the foregoing, we find the trial court did not err by denying appellant's motion to suppress the identification testimony. Appellant's first assignment of error is overruled.

## IV. Third Assignment of Error – R.C. 2933.83(C)(3) Jury Instruction

{¶ 63} Appellant's third assignment of error asserts the trial court erred by failing to instruct the jury pursuant to R.C. 2933.83(C)(3). R.C. 2933.83(C)(3) provides that, when evidence of noncompliance with R.C. 2933.83 "is presented at trial, the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or related to the lineup." *See State v. Stevenson*, 2d Dist. No. 24821, 2012-Ohio-3396, ¶ 16 (observing that "the 'penalty' for failure to comply with R.C. 2933.83 is not suppression," but the R.C. 2933.83(C)(3) jury instruction); *State v. Woods*, 1st Dist. No. C-130413, 2014-Ohio-3892, ¶ 27.

{¶ 64} "The rule regarding jury instructions is that requested instructions in a criminal case must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181 (1995). "[T]he standard of review for an appellate court is whether the trial court abused its discretion by refusing to give a requested jury instruction under the particular facts and circumstances of the case." *State v. Jones*, 10th Dist. No. 12AP-1091, 2014-Ohio-674, ¶ 11, citing *State v. Stewart*, 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 9. An abuse of discretion occurs when a court's judgement is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983); *State v. Clark*, 71 Ohio St.3d 466, 470 (1994).

{¶ 65} At trial, but outside the presence of the jury, defense counsel asked the court to provide the jury with the R.C. 2933.83 "special jury instruction." (Tr. Vol. III at 562.) The court noted that counsel had not provided the court with a copy of the requested instruction, and the court told counsel to "bring [a copy of the requested jury instruction] tomorrow." (Tr. Vol. III at 566.) The record demonstrates no further discussion regarding the R.C. 2933.83(C)(3) instruction.

{¶ 66} Even if we assume that defense counsel sufficiently requested the R.C. 2933.83(C)(3) instruction, the trial court did not abuse its discretion by refusing to provide the instruction. As noted in our analysis of appellant's first assignment of error, the trial court properly concluded that Det. Mall complied with the requirements of R.C. 2933.83 and the Training Supplement. The only technical noncompliance with the statute was

Mora's failure to sign the photo array form, which the trial court reasonably found excusable due to Mora's medical condition. As such, the R.C. 2933.83(C)(3) instruction regarding noncompliance with R.C. 2933.83 was not warranted in the present case. *See State v. Simpson*, 2d Dist. No. 25163, 2013-Ohio-1696, ¶ 18 (holding that when a defendant fails to demonstrate "any material non-compliance with [R.C. 2933.83]," an "instruction on non-compliance [is] not warranted"); *Young*, 2017-Ohio-9028, at ¶ 37 (noting where there is "no evidence of the failure to comply with any procedure adopted by the Columbus police, or any evidence of failure to comply with any section of R.C. 2933.83," the trial court is not "required to give a jury instruction pursuant to R.C. 2933.83(C)(3)"); *Howard*, 2014-Ohio-2176, ¶ 35.

{¶ 67} Furthermore, the R.C. 2933.83(C)(3) instruction is warranted only when evidence of noncompliance "is presented at trial." R.C. 2933.83(C)(3). Although Mora testified at trial regarding the photo array, and the state admitted the photo array form, neither party presented evidence regarding R.C. 2933.83 or any purported noncompliance with the statute.[6] Thus, as evidence of noncompliance with R.C. 2933.83 was not presented at trial, the trial court was not required to instruct the jury pursuant to R.C. 2933.83(C)(3). *Accord State v. Thompson*, 4th Dist. No. 12CA688, 2013-Ohio-2235, ¶ 24 (observing that, although defense counsel cross-examined the sheriff regarding "possible alternative methods in which the identification could have been conducted," as the testimony "never discusse[d] the requirements under R.C. 2933.83, or the sheriff department's purported noncompliance with such requirements," the trial court was "not required to give an instruction" pursuant to R.C. 2933.83(C)(3)); *State v. Henry*, 6th Dist. No. L-11-1157, 2012-Ohio-5552, ¶ 46 (finding the R.C. 2933.83(C)(3) instruction not warranted as "appellant admit[ted] that counsel did not argue noncompliance with the statute during trial"); *State v. Wells*, 8th Dist. No. 98388, 2013-Ohio-3722, ¶ 99.

---

[6] Although Mora testified on direct and cross-examination regarding the photo array, neither the prosecutor nor defense counsel asked Mora about the requirements of R.C. 2933.83, and neither party addressed the fact that Mora did not sign the photo array form. While defense counsel asked Det. Hughes if he was aware the Ohio Revised Code set out certain procedures for conducting photo arrays, counsel did not reference R.C. 2933.83 specifically or ask Det. Hughes about any of the statutory requirements. During closing argument, defense counsel informed the jury that there was "a statute that covers how [photo arrays are] done. There's a Columbus police directive that dictates how photo array[s] should be done. And the reason the statute and the police department have the specific, very detailed descriptions on how a photo array should be done is because of the issue we have in this country of mistaken identification." (Tr. Vol. IV at 701-02.) However, counsel did not specifically mention R.C. 2933.83 or argue any specific violation of the statute.

{¶ 68} The trial court also provided the jury with general instructions regarding the credibility of witnesses, the value of identification testimony, and the credibility of identification witnesses. This court has observed that a trial court's "general [jury] instructions regarding the value of identification testimony and credibility of identification witnesses" allows the jury to "assess the value of photo identification testimony." *State v. Lytle*, 10th Dist. No. 15AP-748, 2016-Ohio-3532, ¶ 79 (holding that, as the trial court provided the jury with general credibility instructions, the court's failure to instruct the jury pursuant to R.C. 2933.83(C)(3) did not amount to plain error). *Accord Thompson* at ¶ 24; *Wells* at ¶ 100; *State v. Lennon*, 8th Dist. No. 104344, 2017-Ohio-2753, ¶ 76. Thus, the court's general instructions in the present case allowed the jury to assess the value of the photo identification testimony presented.

{¶ 69} Based on the foregoing, appellant's third assignment of error is overruled.

## V. Seventh Assignment of Error – Sufficiency & Manifest Weight

{¶ 70} Appellant's seventh assignment of error asserts the trial court violated his rights to due process and a fair trial by entering a judgment of conviction based on insufficient evidence and which was against the manifest weight of the evidence. The legal concepts of sufficiency and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 71} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a verdict. *Thompkins* at 386. Whether the evidence is legally sufficient to support a verdict is a question of law. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed on sufficiency of the evidence unless, after viewing the evidence in the light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 72} "[T]he criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. Thus, while

there may be sufficient evidence to support a judgment, a court may nevertheless conclude that a judgment is against the manifest weight of the evidence. *Thompkins* at 387. When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 73} In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, we afford great deference to the jury's determination of witness credibility. *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55. *See State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus (stating that credibility determinations are primarily for the trier of fact). The fact finder is free to believe "all, part, or none of the testimony of each witness appearing before it," and if evidence "is susceptible to more than one construction, reviewing courts must give it the interpretation that is consistent with the verdict and judgment." *Cattledge* at ¶ 6, citing *Hill v. Briggs*, 111 Ohio App.3d 405, 412 (10th Dist.1996), and *White v. Euclid Square Mall*, 107 Ohio App.3d 536, 539 (8th Dist.1995).

{¶ 74} In the present case, the state submitted and relied on circumstantial evidence. Circumstantial evidence is " 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.' " *State v. Griesheimer*, 10th Dist. No. 05AP-1039, 2007-Ohio-837, ¶ 26, quoting *State v. Bentz*, 2 Ohio App.3d 352, 355 (1st Dist.1981), fn. 6. As circumstantial

evidence and direct evidence " 'inherently possess the same probative value,' " a "criminal conviction can be based entirely or in part on circumstantial evidence." *State v. Schulman*, 10th Dist. No. 19AP-566, 2020-Ohio-4146, ¶ 45, quoting *Jenks* at 272. *See State v. Hunt*, 10th Dist. No. 06AP-1155, 2007-Ohio-3281, ¶ 15, citing *State v. Richey*, 64 Ohio St.3d 353, 363 (1992) and *Jenks* (noting that "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence"); *State v. Lott*, 51 Ohio St.3d 160, 167 (1990), citing *State v. Apanovitch*, 33 Ohio St.3d 19 (1987) (stating that "[m]urder convictions and death sentences can rest solely on circumstantial evidence").

{¶ 75} Appellant was convicted of all counts and specifications charged in the indictment. The court sentenced appellant on the charges pertaining to the purposeful murders of Black and Holloway, the attempted purposeful murder of Mora, tampering with evidence, and the firearm specifications attached to the murder charges.

{¶ 76} R.C. 2903.02(A) defines murder, providing that "[n]o person shall purposely cause the death of another." A person acts purposely when "it is [the offender's] specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is [the offender's] specific intention to engage in conduct of that nature." R.C. 2901.22(A). "[A]n intent to kill 'may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound.' " *State v. Eley*, 77 Ohio St.3d 174, 180 (1996), quoting *State v. Robinson*, 161 Ohio St. 213 (1954), paragraph five of the syllabus. *See State v. Sevilla*, 10th Dist. No. 06AP-954, 2007-Ohio-2789, ¶ 10, citing *State v. Waddell*, 10th Dist. No. 99AP-1130 (Aug. 15, 2000) (noting that "[a]n accused's specific intent to kill may be reasonably inferred from the fact that a firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce death").

{¶ 77} R.C. 2923.02(A) defines attempt, providing that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." *See State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶ 101, quoting *State v. Woods*, 48 Ohio St.2d 127 (1976), at paragraph one of the syllabus (defining " 'criminal attempt' as 'an act or omission constituting a substantial step in a course of conduct planned to culminate in [the actor's] commission of the crime' "). R.C. 2941.145(A) provides for a

three-year mandatory prison term when the defendant had a firearm on their person or under their control while committing the offense and either displayed the firearm, brandished the firearm, indicated they possessed the firearm, or used it to facilitate the offense.

{¶ 78} R.C. 2921.12(A)(1) defines the crime of tampering with evidence, providing that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." "When an offender commits an unmistakable crime, the offender has constructive knowledge of an impending investigation of the crime committed." *State v. Schmitz*, 10th Dist. No. 05AP-200, 2005-Ohio-6617, ¶ 17, citing *State v. Cockroft*, 10th Dist. No. 04AP-608, 2005-Ohio-748, ¶ 11. *See State v. Brodbeck*, 10th Dist. No. 08AP-134, 2008-Ohio-6961, ¶ 51.

{¶ 79} Appellant asserts the "main issue" in the case was the identity of the shooter and contends that Mora's identification of him was unworthy of belief. (Appellant's Brief at 45.) In a sufficiency analysis, however, courts "do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 16. "The identity of a perpetrator may be established by the use of direct or circumstantial evidence." *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 18, citing *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046.

{¶ 80} Mora identified appellant at trial as the neighbor/friend who was inside Black's apartment on October 24, 2017. Mora testified she never actually saw a gun the entire time she was in Black's apartment, and she never saw the neighbor/friend's hands, as he kept his hands in the pocket of his hoodie. However, Mora's testimony demonstrated that she, Black, Holloway, and appellant were the only people inside the apartment when the shooting began, and that appellant was the only person gone from the apartment after the shooting. Thus, Mora's testimony was significant circumstantial evidence which allowed the jury to identify appellant, beyond a reasonable doubt, as the shooter. "[T]he testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Hood*, 10th Dist. No. 15AP-656, 2015-Ohio-5375, ¶ 11, citing *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 81} Furthermore, even absent Mora's identification of appellant, other evidence in the case permitted the jury to identify appellant as the shooter. "[A]n accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." (Internal quotations and citations omitted.) *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 167. Flight, in this regard, means " 'some escape or affirmative attempt to avoid apprehension.' " *State v. Robinson*, 10th Dist. No. 17AP-853, 2019-Ohio-558, ¶ 29, quoting *State v. Robinson*, 1st Dist. No. C-060434, 2007-Ohio-2388, ¶ 19. *See State v. Davenport*, 10th Dist. No. 18AP-393, 2019-Ohio-2297, ¶ 44, citing *State v. Ramos*, 8th Dist. No. 103596, 2016-Ohio-7685, ¶ 28 (stating that "[f]light requires an appreciation by the accused that he or she has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found"). *See also State v. Hamilton*, 10th Dist. No. 11AP-981, 2012-Ohio-2995, ¶ 15 (finding evidence demonstrating consciousness of guilt as the defendant "fled the shooting scene, threw his gun in the river, and hid from the police in Welch's basement"); *State v. Daley*, 10th Dist. No. 19AP-561, 2020-Ohio-4390, ¶ 47 (noting the evidence that defendant "disposed of the murder weapon," did not return to his home, and "made an effort to change his physical appearance by cutting his dreadlocks" constituted "proof of appellant's consciousness of guilt"); *State v. Herrell*, 6th Dist. No. L-16-1173, 2017-Ohio-7109, ¶ 24, quoting *State v. Wesley*, 8th Dist. No. 80684, 2002-Ohio-4429, ¶ 19 (stating that "flight" may include conduct such as " 'fleeing from the police or eyewitnesses, to changing or disguising one's physical characteristics after the fact,' " and that "[c]hanging clothes is enough to satisfy the changing of one's appearance"); *State v. Washington*, 10th Dist. No. 09AP-424, 2009-Ohio-6665, ¶ 30.

{¶ 82} The evidence presented at trial demonstrated appellant was walking in the Winchester Park apartment complex a few minutes after the shooting occurred. When appellant saw Sgt. Hurst he gave a "look of panic" and took off running. (Tr. Vol. II at 280.) Officer Heflin noted that, when Deputy Coburn discovered appellant in the tall marsh grass, appellant was lying "[p]erfectly still. Trying to act like he wasn't there basically." (Tr. Vol. II at 313.) When appellant ran from Sgt. Hurst he was wearing a black hoodie, and when officers discovered appellant in the marsh he was wearing only a white T-shirt. Thus, the evidence of appellant's flight at the sight of police, attempt to hide in the tall marsh grass,

and attempt to change his appearance by removing his hoodie was evidence indicative of consciousness of guilt and, thus, of guilt itself.

{¶ 83} The evidence also demonstrated that the murder weapon was discovered in the pond next to where appellant was discovered hiding in the marsh. Forensic testing on the clothing articles discovered balled up underneath appellant in the marsh demonstrated appellant's DNA was on the glove and the hat, and that gunshot residue was on the glove and the black hoodie.

{¶ 84} Thus, the state's evidence, if believed, demonstrated that appellant was the man inside Black's apartment on October 24, 2017 who shot at Mora, Black, and Holloway. Appellant shot Black and Holloway directly in their heads, causing their deaths, and fired shots at Mora which caused grazing wounds. Such evidence demonstrated appellant acted purposely to cause and attempt to cause the victims' deaths. *See State v. Easley*, 10th Dist. No. 07AP-578, 2008-Ohio-468, ¶ 37 (finding the evidence that defendant "pointed the gun at [the victim's] face" and "pressed the trigger" sufficient to prove that the defendant "with purpose, attempted to cause [the victim's] death"); *Sevilla*, 2007-Ohio-2789, ¶ 11; *State v. Goodwin*, 84 Ohio St.3d 331, 347 (1999). As officers discovered appellant hiding in the marsh near the pond shortly after the murders occurred, and the murder weapon was discovered in the pond the next day, the circumstantial evidence permitted the jury to find that appellant attempted to conceal the murder weapon by throwing it into the pond.

{¶ 85} After viewing the evidence in a light most favorable to the prosecution, we find a rational trier of fact could have found the state established, beyond a reasonable doubt, that appellant committed the charged offenses. As such, appellant fails to demonstrate that his convictions were supported by insufficient evidence.

{¶ 86} Appellant contends his convictions were against the manifest weight of the evidence due to differences between Mora's description of the suspect's appearance and appellant's actual appearance on October 24, 2017. Appellant notes that while Mora testified the neighbor/friend from Black's apartment was approximately five-foot seven-inches tall and 30 years old, appellant was five-foot ten-inches tall and 21 years old on October 24, 2017. Appellant also notes that while Mora testified the suspect wore a black hoodie and black shoes, appellant was wearing red and white stripped shoes at the time of his arrest and the black hoodie discovered underneath him in the marsh had a white Under Armor logo on it.

{¶ 87} However, the jury also heard Mora's testimony explaining that the neighbor/friend was "sitting down most of the time" at Black's apartment, and that she believed the man was about 30 years old because that was "[her] age at the time." (Tr. Vol. II at 194-95.) On redirect-examination, Mora stated she was not 100 percent certain whether the neighbor/friend's hoodie had a "logo or side stripe" on it, and that she did not "remember at the time" what the man's shoes looked like, noting she "seen black and that was it." (Tr. Vol. II at 240.)

{¶ 88} The jury was able to weigh the differences between Mora's description of the suspect's appearance and appellant's appearance on October 24, 2017. The jury was in the best position to assess Mora's credibility, observing her gestures and demeanor while testifying. Our review of the entire record demonstrates that the discrepancies between Mora's description of the suspect and appellant's appearance were not so great as to support a finding that the jury clearly lost its way and created a manifest miscarriage of justice by relying on Mora's testimony. *See State v. Fletcher*, 2d Dist. No. 2003-CA-62, 2004-Ohio-4517, ¶ 79 (noting that, even if "discrepanc[ies] existed in estimates of the robber's height, this was a matter for the jury to weigh," and the jury presumably "considered this point and found that it did not outweigh the positive identifications"); *Thompson* at ¶ 18 (stating that "[i]t is not reasonable to expect * * * [the witness's] description [of the perpetrator to] be perfect," and finding the witness's "description and appellant's appearance were similar enough to bolster the reliability of the identification"). Notably, Mora's general description of the neighbor/friend as an African-American male of average build, with facial hair, wearing black clothing, matched appellant's appearance on the day of the shooting.

{¶ 89} Appellant further asserts that Mora's identification of him lacked credibility because Det. Mall "administered an unduly suggestive photo array." (Appellant's Brief at 46.) However, for the reasons stated in our analysis of appellant's first assignment of error, Det. Mall did not administer an unnecessarily suggestive photo array. Moreover, Mora's identification of appellant from the photo array was not inherently unreliable.

{¶ 90} Although Mora had never met the neighbor/friend prior to the shooting, she explained that she was in the apartment with the man for approximately 45 minutes to one hour before the shooting began. Mora affirmed she had "plenty of opportunity" to look at the man, and specifically stated that she was "trying to get a good look at the guy" as she folded laundry. (Tr. Vol. II at 197, 225.) While appellant notes that Mora stated she could

not see the man's forehead or eyebrows because the hood of his hoodie was pulled up, Mora also testified that what stood out to her about the number six photograph in the array was the "nose and chin and lips." (Tr. Vol. II at 219.) Det. Mall presented the photo array to Mora only a couple hours after the shooting occurred. While Mora did not have a particularly high level of certainty in her selection of appellant's photo, the jury heard Mora's testimony explaining that she only believed the number six photograph was "possibly" the suspect. (Tr. Vol. II at 241.) Thus, the jury was able to weigh Mora's low level of certainty in the identification when assessing the appropriate weight to assign to Mora's identification of appellant from the photo array.

{¶ 91} Appellant also notes Mora's testimony indicating that, a few weeks after the shooting, her family showed her a picture of someone on Facebook who they said was appellant. Mora stated the Facebook picture "didn't look like [the neighbor/friend] at all." (Tr. Vol. II at 238-39.) However, as appellant did not present a copy of the Facebook picture at trial, it was impossible for the jury to assess whether the picture Mora viewed on Facebook was a photo of appellant.[7] The evidence that Mora viewed a picture of someone on Facebook who did not look like appellant does not indicate that appellant's convictions were against the manifest weight of the evidence.

{¶ 92} Appellant further contends his convictions were against the weight of the evidence because gunshot residue was not discovered on his hands or the toboggan hat, and because the state's expert agreed that the gunshot residue on the glove and hoodie could have been deposited by secondary transfer. Schwesinger explained that secondary transfer of gunshot residue could occur "if a weapon was fired in this area and I touched the counter and there's gunshot residue that would transfer onto my hand, so that would be a secondary transfer because I wasn't the one who fired the weapon." (Tr. Vol. III at 436.) Schwesinger further explained that gunshot residue could be "easily * * * removed or washed away," and that exposure to rain or wetness "could potentially diminish the amount of gunshot residue present." (Tr. Vol. III at 434, 441.)

{¶ 93} Appellant presented evidence demonstrating that Officer Heflin was not wearing gloves when he grabbed the clothes and brought them out of the marsh. The jury

---

[7] We also note that, as Mora's family showed her the Facebook picture, there was no state action involved in the Facebook identification. *See Brown*, 38 Ohio St.3d at 310-11; *Monford*, 2010-Ohio-4732, at ¶ 55, citing *State v. Ware*, 10th Dist. No. 04AP-43, 2004-Ohio-6984; *Gross*, 2002-Ohio-5524, at ¶ 22.

also saw video clips from the time of appellant's apprehension which demonstrated that, after Officer Heflin brought the clothes out of the marsh, he placed them on the ground and another officer then kicked the clothes. Schwesinger acknowledged that, if gunshot residue was present on the hands or feet of an officer, and the officer touched or kicked the clothes, such scenario presented the possibility of secondary transfer of gunshot residue.

{¶ 94} Accordingly, the jury heard and saw evidence demonstrating that the gunshot residue on the glove and hoodie could have been deposited by secondary transfer. It was within the province of the jury to weigh this evidence and, considering the entire record and weighing all reasonable inferences, we do not find that the jury clearly lost its way or committed a manifest miscarriage of justice by finding the evidence of the gunshot residue on the hoodie and glove indicative of the fact that appellant fired the murder weapon.

{¶ 95} Appellant lastly asserts that his convictions were against the manifest weight of the evidence because his DNA was not found at the scene of the murders or on the murder weapon. Olson explained that many factors could affect how much DNA was left behind on a surface, noting that "rain or any other precipitation can help kind of wash away the DNA." (Tr. Vol. III at 513.) Olson stated that the firearm being submerged in the pond for some time "would decrease the amount of DNA present." (Tr. Vol. III at 531.) Although Olson tested swabs taken from various locations in Black's apartment, including the interior doorknob, back of the dining table chair, dining tabletop, and back of the chair in the hallway, the samples all contained an insufficient quantity of DNA for testing purposes.

{¶ 96} However, this court has consistently held that " 'a lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence.' " *State v. Murray*, 10th Dist. No. 16AP-16, 2017-Ohio-949, ¶ 38, quoting *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21. If witness testimony is believed, " 'then the lack of fingerprints, DNA, footprints or any other [type of] physical evidence does not render the conviction against the manifest weight of the evidence.' " *Peeples* at ¶ 21, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16. *See State v. Poindexter*, 10th Dist. No. 19AP-394, 2021-Ohio-1499, ¶ 22 (noting the "state is not obligated to produce DNA evidence linking a defendant to the crime to secure a conviction"). Significant circumstantial evidence presented in the case permitted the jury to conclude that appellant was the neighbor/friend in Black's apartment on October 24, 2017 who shot and wounded Mora, fatally shot both Black and Holloway, and who then

attempted to dispose of the murder weapon by throwing it into the pond. The lack of appellant's DNA on the Glock firearm or in Black's apartment did not outweigh the other credible evidence pointing to appellant as the assailant.

{¶ 97} Considering the foregoing, this is not the exceptional case in which the evidence weighs heavily against the conviction. *Thompkins*, 78 Ohio St.3d at 387. The jury heard testimony from the witnesses and was able to personally observe the witnesses' demeanor, gestures, and voice inflections and use these observations in weighing the credibility of all the witnesses. Having reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses, we find the jury did not clearly lose its way and create such a manifest miscarriage of justice that appellant's convictions must be reversed. Therefore, appellant's convictions are not against the manifest weight of the evidence.

{¶ 98} Based on the foregoing, appellant's seventh assignment of error is overruled.

## VI. Second Assignment of Error – Defense Closing Argument

{¶ 99} Appellant's second assignment of error asserts the trial court erred by limiting defense counsel's closing argument. "Parties are granted latitude in closing arguments, and the question as to the propriety of these arguments is generally considered one falling within the sound discretion of the trial court." *State v. Loza*, 71 Ohio St.3d 61, 78 (1994), citing *State v. Maurer*, 15 Ohio St.3d 239, 269 (1984).

{¶ 100} During closing argument, defense counsel addressed Det. Mall's presentation of the photo array to Mora. Defense counsel began reading from a transcript of Det. Mall's hospital interview with Mora, and the state objected.[8] Outside the presence

---

[8] Defense counsel noted various statements from Det. Mall's hospital interview with Mora, including Det. Mall asking Mora, "So you're okay with all those instructions I read to you? And she says, Uh-huh, yes. All right. Let me show you this photo array here." (Tr. Vol. IV at 703.) Defense counsel continued stating, "[h]e said to her, No? You don't recognize anyone? And she said, Huh-uh, no. Twice." (Tr. Vol. IV at 703-04.) Counsel addressed the exchange between Det. Mall and Mora after Det. Mall asked Mora if there was anything important he should know, stating as follows:

> And she says, I was thinking, like, I'm thinking now, the one picture, its similar. Similar. I don't know want [sic] to make any innocent person a victim at all or a suspect.
>
> Detective says, "I understand."
>
> "But the face, round, like, if he had more hair on his face like people are growing."

of the jury, the court noted that defense counsel was "reading statements by Detective Mall," and defense counsel acknowledged he was reading from a transcript of "the tape" of the hospital interview. (Tr. Vol. IV at 706-07.) The court told defense counsel that he could say "what [Mora] said in court," but could not read from the hospital interview transcript as it was not in evidence. (Tr. Vol. IV at 708.) The court then instructed the jury that the evidence did not include "closing statements or arguments of counsel," and that if counsel had indicated "something was said or not said in court, then it's up to you to consider what you heard in court." (Tr. Vol. IV at 709-10.)

{¶ 101} Appellant initially contends that defense counsel could read from the hospital interview transcript during closing argument because "defense counsel cross-examined Mora regarding both Det. Mall's questions to her and her responses." (Appellant's Brief at 24.) While defense counsel cross-examined Mora regarding Det. Mall's questions and her responses from the hospital interview, neither the audio recording nor a transcript of the hospital interview were presented as evidence at trial.[9] (Tr. Vol. II at

---

\* \* \*

So then she says, "if he had like a hoodie probably. Probably.["]

\* \* \*

She said, "Probably, but I don't know him at all." ["]Probably, but I don't know him at all."

Detective said, Okay.

(Tr. Vol. IV at 704-05.) The state then objected.

[9] Although the audio recording of the hospital interview was admitted as evidence at the suppression hearing, it was not played for the jury or admitted into evidence at trial. During his cross-examination of Mora, defense counsel asked Mora questions about the statements Det. Mall made to her at the hospital, including the following:

Do you recall him saying to you, "Do you understand these instructions I read to you?" And you said, "Yeah, but why would you guys have pictures today of him?"

\* \* \*

And then he said to you, no, you don't recognize anyone? And then you responded, huh-uh -- indicating no?

\* \* \*

And then he said to you, you had never seen the guy in the black hoodie before today? And your answer was, huh-uh -- again, indicating no?

233-38.) The questions defense counsel posed to Mora on cross-examination were not evidence. *See State v. Walters*, 10th Dist. No. 06AP-693, 2007-Ohio-5554, ¶ 81 (noting that "counsel's words in posing a question are not 'evidence' "); *State v. Bailey*, 2d Dist. No. 27177, 2017-Ohio-2679, ¶ 26; *Corporate Exchange Bldgs. IV & V, Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 82 Ohio St.3d 297, 298 (1998).

{¶ 102} " 'Neither the defense nor the prosecution may refer to evidence that is not in the record.' " *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 286, quoting *Brown*, 38 Ohio St.3d at 316, fn. 7. *See State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 306, quoting *State v. Powell*, 177 Ohio App.3d 825, 2008-Ohio-4171, ¶ 45 (4th Dist.) (stating that " '[t]rial counsel may advocate and persuade to the limit of his or her ability and enthusiasm but cannot misrepresent evidence' "). Accordingly, as neither the audio recording nor the transcript of the hospital interview were presented at trial, defense counsel could not read from the transcript during closing argument. *Compare State v. Prysock*, 10th Dist. No. 86AP-492 (July 16, 1987) (finding no error in the trial court's decision to allow the prosecution to read from a state-prepared transcript of the defendant's taped interview during closing argument, because the jury had also heard the recording of the taped interview during trial).

{¶ 103} Appellant further asserts the court's instructions to the jury during defense counsel's closing argument "effectively nullified [counsel's] remarks" by calling those statements into question. (Appellant's Brief at 24.) We disagree. The trial court properly instructed the jury that closing arguments were not evidence, and that the jury should rely on their own recollections as to the evidence presented during trial. We presume the jury followed the court's instructions. *State v. Trewartha*, 10th Dist. No. 05AP-513, 2006-Ohio-5040, ¶ 21, citing *State v. Raglin*, 83 Ohio St.3d 253, 264 (1998); *State v. Brown*, 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 21. As the trial court did not instruct the jury to disregard any portion of defense counsel's closing argument, we find no support for appellant's contention that the jury did so.

{¶ 104} Based on the foregoing, appellant's second assignment of error is overruled.

---

* * *

[H]e asked you the question, "Anything else that I haven't talked to you about?"

(Tr. Vol. II at 234-36.)

## VII. Fourth Assignment of Error – Search Warrant Evidence

{¶ 105} Appellant's fourth assignment of error asserts the trial court erred by admitting hearsay evidence regarding a search warrant and that the search warrant evidence destroyed the presumption of innocence. *See* R.C. 2901.05(A) (stating that "[e]very person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution").

{¶ 106} The admission or exclusion of relevant evidence lies within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. A reviewing court will not disturb a trial court's evidentiary decisions in the absence of an abuse of discretion which has created material prejudice. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 66, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62.

{¶ 107} Det. Hughes testified that his role in the investigation was to "create the search warrant" for 4022 Alwood Lane, an apartment located near Black's apartment. (Tr. Vol. III at 487-88.) Det. Hughes stated he created the search warrant for 4022 Alwood after he "was advised that the suspect out of this case, that was his residence." (Tr. Vol. III at 488.) Defense counsel objected, arguing that Det. Hughes' statement was hearsay and untrue. The court overruled the objection.

{¶ 108} Appellant contends Det. Hughes' statement was inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). Hearsay is inadmissible unless an exception applies. Evid.R. 802. "Where an out-of-court statement is offered without reference to its truth, the statement is not hearsay." *State v. Payne*, 10th Dist. No. 02AP-723, 2003-Ohio-4891, ¶ 63. *Accord Maurer*, 15 Ohio St.3d at 262 (explaining that to constitute hearsay, two elements are needed: (1) "there must be an out-of-court statement," and (2) "the statement must be offered to prove the truth of the matter asserted").

{¶ 109} "[S]tatements offered to explain a police officer's conduct while investigating a crime are not hearsay because they are not offered for their truth, but, rather, are offered as an explanation of the process of investigation." *State v. Chandler*, 10th Dist. No. 10AP-972, 2011-Ohio-3485, ¶ 16, citing *State v. Bartolomeo*, 10th Dist. No.

08AP-969, 2009-Ohio-3086, ¶ 17. *Accord Payne* at ¶ 63 (noting that "statements which are offered to explain a police officer's conduct while investigating the crime are not hearsay"); *State v. Matthews*, 1st Dist. No. C-060669, 2007-Ohio-4881, syllabus (holding the trial court did not err in "admitting the testimony of police officers that they had reports of drug activity at a certain apartment," because the testimony was "not admitted for the truth of the matter asserted, but to show why the police officers had obtained and executed a search warrant for that particular address"); *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 117.

{¶ 110} Det. Hughes' testimony that he drafted the search warrant for 4022 Alwood after he was advised the suspect of the investigation lived at that address was not offered to prove the truth of the matter asserted in the statement. Rather, the statement was admitted to show why police obtained and executed a search warrant for 4022 Alwood. Accordingly, as the statement was not offered to prove that appellant lived at 4022 Alwood, it was not hearsay, and the trial court did not err by admitting the statement.

{¶ 111} Appellant further contends the jury learning of the search warrant for 4022 Alwood destroyed the presumption of innocence. However, this court has previously found no authority for the proposition that "evidence regarding search warrants issued during the investigation of a crime is, per se, inadmissible as evidence at the trial of the matter or that the erroneous admission of such evidence deprives a criminal defendant of his or her statutory and constitutional right to the presumption of innocence." *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 23. Appellant fails to direct this court to any authority demonstrating that evidence of a search warrant obtained during the investigation of the matter destroys the presumption of innocence.[10]

{¶ 112} The trial court instructed the jury that appellant was "presumed innocent unless guilt [was] established beyond a reasonable doubt," and that the state had the burden to produce evidence establishing appellant's guilt beyond a reasonable doubt.

---

[10] *See also Mays v. Dayton*, 134 F.3d 809, 814 (6th Cir.1998), citing *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) (stating that "search warrants are directed, not at persons, but at specific locations where there is probable cause to believe the instrumentalities or evidence of crimes will be found"); *United States v. Wagers*, 452 F.3d 534, 541 (6th Cir.2006) (observing that the test for whether probable cause exists to support a search warrant "is not fettered by the presumption of innocence embodied in the test for conviction"). *See also State v. Jones*, 10th Dist. No. 18AP-33, 2019-Ohio-2134, ¶ 64, citing *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, ¶ 75 (stating that "[e]vidence about a defendant's arrest and ensuing custody does not contravene the presumption of innocence").

(Tr. Vol. IV at 635.) We presume the jury followed the court's instructions. *Oteng* at ¶ 23, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160.

{¶ 113} Moreover, the state never presented evidence demonstrating appellant lived at 4022 Alwood. A member of the crime scene search unit explained that, although the unit searched 4022 Alwood, they discovered "no evidence deemed valuable" at that location. (Tr. Vol. III at 419.) Det. Hughes admitted on cross-examination that he did not have any personal knowledge regarding whether appellant lived at 4022 Alwood. The evidence demonstrating that police obtained and executed a search warrant for 4022 Alwood did not destroy the presumption of innocence in the present case.

{¶ 114} Based on the foregoing, appellant's fourth assignment of error is overruled.

## VIII. Fifth Assignment of Error – Consciousness of Guilt Instruction

{¶ 115} Appellant's fifth assignment of error asserts the trial court erred by instructing the jury on consciousness of guilt. Appellant objected to the court's consciousness of guilt instruction, and the court overruled the objection.

{¶ 116} As noted, evidence of flight is admissible to show consciousness of guilt. *Hand*, 2006-Ohio-18, at ¶ 167. Flight includes evidence of escape or some affirmative attempt to avoid apprehension. *Id.*; *Davenport*, 2019-Ohio-2297, at ¶ 44. A jury instruction on consciousness of guilt " 'based upon the flight of the accused is appropriate when supported by sufficient evidence in the record.' " *Robinson*, 2019-Ohio-558, ¶ 29, quoting *State v. Grindstaff*, 12th Dist. No. CA2013-09-074, 2014-Ohio-2581, ¶ 29. *Accord Woods*, 2014-Ohio-3892, ¶ 60, citing *Robinson*, 2007-Ohio-2388, ¶ 19 (stating that "[a]n instruction on flight as it relates to a defendant's consciousness of guilt is proper if there is sufficient evidence of escape or some affirmative attempt to avoid apprehension"). "An instruction on flight 'is treated as part of the overall jury instructions and is reviewed in the context of the entire jury instructions.' " *Robinson*, 2019-Ohio-558, at ¶ 29, quoting *State v. Anderson*, 7th Dist. No. 03 MA 252, 2006-Ohio-4618, ¶ 108. *Accord State v. Rutledge*, 10th Dist. No. 17AP-590, 2019-Ohio-3460, ¶ 31.

{¶ 117} The trial court provided the jury with the following instruction regarding consciousness of guilt:

> Testimony has been admitted indicating that the defendant fled the area near the scene of the crime as the police were approaching and attempted to hide. You are instructed that such conduct by the defendant alone does not raise a

presumption of guilt, but it may tend to indicate the defendant's consciousness or awareness of guilt. If you find the facts do not support that the defendant fled the area near the crime scene as police were approaching and attempted to hide, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by the consciousness or an awareness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the such charge. You alone will determine what weight, if any, to give to this evidence.

(Tr. Vol. IV at 642-43.)

{¶ 118} Appellant acknowledges that the court's instruction was consistent with the consciousness of guilt instruction stated in Ohio Jury Instructions, Section CR 409.13(1). *See State v. Ellis*, 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 12 (noting that, while the "Ohio Jury Instructions are not binding legal authority, it is significant that the trial court's instructions here are also consistent with the language from the Ohio Jury Instructions"). Appellant also acknowledges that the instruction was supported by sufficient evidence in the record. Indeed, as the evidence demonstrated that appellant ran at the sight of police and was discovered hiding in the tall marsh grass, the consciousness of guilt instruction was appropriate in the present case. *See State v. Ingram*, 3d Dist. No. 1-08-53, 2009-Ohio-1302, ¶ 20 (finding consciousness of guilt instruction appropriate where the defendant ran and hid in between some apartment buildings when he saw a police cruiser searching the area in response to a dispatch call about shots being fired); *State v. Braylock*, 6th Dist. No. L-08-1433, 2010-Ohio-4722, ¶ 38; *State v. Lewis*, 4th Dist. No. 14CA3465, 2016-Ohio-1592, ¶ 27; *State v. McCullough*, 3d Dist. No. 12-07-09, 2008-Ohio-3055, ¶ 41.

{¶ 119} Rather, appellant contends the court's instruction was improper because it "effectively nullified the defense's argument as to [the] shooter's identity and directed the jury to find guilt" based solely on the evidence of flight. (Appellant's Brief at 37.) To the contrary, the court's instruction was neutral in its effect, as it instructed the jury that it could, but was not required to, consider the evidence of appellant's flight in deciding whether appellant was guilty of the crimes charged. The instruction also expressly permitted the jury to find that appellant's flight was motivated by reasons other than

consciousness of guilt, and to not further consider the evidence for any purpose.[11]  *See Davenport*, 2019-Ohio-2297, at ¶ 55 (finding similar consciousness of guilt instruction "neutral in its effect, providing that the jury may, but was not required to, consider evidence of [the defendant's] conduct in deciding whether [the defendant] was guilty of the crime charged"); *State v. White*, 2d Dist. No. 26093, 2015-Ohio-3512, ¶ 49, 51 (finding a similar consciousness of guilt instruction "all but innocuous," as the instruction informed the jury that, even if they found the defendant's flight was motivated by consciousness of guilt, they were not "required to consider the flight evidence"); *State v. Taylor*, 78 Ohio St.3d 15, 27 (1997); *State v. Bass*, 10th Dist. No. 12AP-622, 2013-Ohio-4503, ¶ 31.

{¶ 120} Reviewing the jury instructions as a whole, we find the court's consciousness of guilt instruction fairly and correctly stated the law applicable to the evidence presented at trial.  As such, the court did not abuse its discretion by providing the jury an instruction regarding consciousness of guilt.  Appellant's fifth assignment of error is overruled.

## IX. Sixth Assignment of Error – Ineffective Assistance of Counsel

{¶ 121} Appellant's sixth assignment of error asserts he was deprived of the effective assistance of trial counsel, in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.  Appellant contends his counsel rendered constitutionally ineffective assistance by failing to provide the trial court with the R.C. 2933.83(C)(3) jury instruction, failing to object to Det. Hughes' testimony regarding the search warrant, and failing to ensure that Det. Mall testified at trial.

{¶ 122} We apply a two-part test to evaluate claims of ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989).  "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense."  *Strickland* at 687.  "The failure to make either showing defeats a claim of ineffective assistance of counsel."  *State v. Kennard*, 10th Dist. No. 15AP-766, 2016-Ohio-

---

[11] In defense counsel's closing argument, counsel argued, "how many young, 20, 21-year-old black men are not going to think about why a white police officer is rolling by in his cruiser giving him the bad eye," and thus asserted that "[c]onsciousness of guilt [was not] the only reason that a person would turn around and try to get away." (Tr. Vol. IV at 718-19.) The trial court's consciousness of guilt instruction permitted the jury to give credence to defense counsel's argument regarding the motivation for appellant's flight.

2811, ¶ 14, citing *Bradley* at 143. *Accord Strickland* at 697 (stating that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, * * * that course should be followed").

{¶ 123} To demonstrate that counsel's performance was deficient, the defendant must show that his counsel "committed errors which were ' "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." ' " *Kennard* at ¶ 15, quoting *State v. Phillips*, 74 Ohio St.3d 72, 101 (1995), quoting *Strickland* at 687. "Judicial scrutiny of counsel's performance must be highly deferential [and,] [b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689; *Bradley* at 141. "[A] properly licensed attorney is presumed competent [and the defendant] bears the burden of proving that his trial counsel was ineffective." *State v. Hamblin*, 37 Ohio St.3d 153, 155-56 (1988), citing *Vaughn v. Maxwell, Warden*, 2 Ohio St.2d 299, 301 (1965).

{¶ 124} To establish prejudice, a defendant must demonstrate "that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, ¶ 10, citing *Bradley* at paragraphs two and three of the syllabus. " ' "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " *Id.*, quoting *Bradley* at 142, quoting *Strickland* at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [court] cannot be relied on as having produced a just result." *Strickland* at 686. *See In re J.J.A.*, 10th Dist. No. 09AP-242, 2010-Ohio-672, ¶ 14, citing *State v. Hester*, 45 Ohio St.2d 71, 75 (1976) (stating a "verdict adverse to a criminal defendant is not of itself indicative that he received ineffective assistance of trial counsel").

{¶ 125} Appellant initially contends his counsel performed deficiently by failing to provide the court with the R.C. 2933.83(C)(3) jury instruction. As noted above, defense counsel requested the R.C. 2933.83(C)(3) jury instruction, and the court told counsel to bring a copy of the instruction the next day. Although we are unable to discern from the record whether counsel brought the court a copy of the R.C. 2933.83(C)(3) instruction, the court did not provide the jury with the R.C. 2933.83(C)(3) instruction. *See State v. Davis*, 10th Dist. No. 05AP-193, 2006-Ohio-5039, ¶ 19 (explaining that when "allegations of

ineffective assistance of counsel hinge on facts not appearing in the record, the proper remedy is a petition for post-conviction relief rather than a direct appeal").

{¶ 126} However, for the reasons stated in our analysis of appellant's third assignment of error, appellant was not entitled to the R.C. 2933.83(C)(3) instruction. As such, even if defense counsel failed to supply the trial court with a copy of the instruction, such conduct would not have amounted to deficient performance. *See State v. Massey*, 10th Dist. No. 12AP-649, 2013-Ohio-1521, ¶ 13 (stating that "[c]ounsel is not deficient for failing to raise a meritless issue"); *State v. Glenn-Coulverson*, 10th Dist. No. 16AP-265, 2017-Ohio-2671, ¶ 57 (holding that "because R.C. 2933.83 was inapplicable, the trial court was not required to provide the additional R.C. 2933.83(C)(3) instruction" and "trial counsel was not deficient in not requesting such an instruction"); *Young*, 2017-Ohio-9028, at ¶ 43.

{¶ 127} Appellant further asserts that counsel rendered deficient performance by failing to object to Det. Hughes' testimony regarding the search warrant for 4022 Alwood. Although defense counsel objected when Det. Hughes stated he created the search warrant after receiving information that the suspect lived at 4022 Alwood, appellant contends counsel should have objected again "when Det. Hughes discussed probable cause for the search warrant." (Appellant's Brief at 40.) Det. Hughes briefly discussed the process for obtaining a search warrant, stating the process involved identifying the place to be searched, the probable cause for the search, and presenting the proposed search warrant to a duty judge to "have it reviewed." (Tr. Vol. III at 490.)

{¶ 128} However, as noted in our analysis of appellant's fourth assignment of error, this court has found no authority to support the proposition that "evidence regarding search warrants issued during the investigation of a crime is, per se, inadmissible as evidence at the trial of the matter." *Oteng*, 2015-Ohio-1231, at ¶ 23. As such, appellant fails to demonstrate a reasonable probability that counsel's objection to Det. Hughes' testimony would have been successful. *See State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 65, citing *State v. Jones*, 10th Dist. No. 18AP-33, 2019-Ohio-2134, ¶ 52 (stating that "[t]o succeed on a claim of ineffective assistance of counsel based on counsel's failure to file an objection, an appellant must demonstrate that the objection had a reasonable probability of success"). Appellant also fails to demonstrate a reasonable probability that an objection to the search warrant evidence would have altered the outcome of the trial.

*See State v. Thompson*, 10th Dist. No. 18AP-211, 2019-Ohio-2525, ¶ 15, citing *State v. Watts*, 10th Dist. No. 15AP-951, 2016-Ohio-5386, ¶ 42.

**{¶ 129}**   Appellant further contends his trial counsel rendered ineffective assistance by failing to ensure that Det. Mall testified at trial.  The state issued a subpoena to Det. Mall on August 18, 2021, and defense counsel issued a subpoena to Det. Mall on September 14, 2021.   The subpoenas instructed Det. Mall to attend and give testimony at the trial beginning September 21, 2021.  The Franklin County Sheriff's Office served the subpoenas to Det. Mall at the CPD pickup location on August 23 and September 20, 2021, respectively.

**{¶ 130}**   During trial, but outside the presence of the jury, defense counsel informed the court he had subpoenaed Det. Mall after learning that the state did not intend to call Det. Mall as a witness at trial.  Defense counsel then stated that the prosecutor spoke with Det. Mall the night before, and Det. Mall informed the prosecutor that he "never received a copy of that subpoena and was on his way to Kentucky."  (Tr. Vol. III at 562.)  Defense counsel asked the court to either take judicial notice of R.C. 2933.83 and the Training Supplement, or have someone "read into the [trial] transcript" the relevant portions of Det. Mall's testimony from the suppression hearing.  (Tr. Vol. III at 564.)  The trial court suggested that maybe the parties could "get [Det. Mall] on the phone" and "zoom him in." (Tr. Vol. III at 565.)  Defense counsel stated, "I'll call him."  (Tr. Vol. III at 565.)  There is no further indication in the record regarding whether defense counsel spoke with Det. Mall.  Det. Mall did not testify at trial.

**{¶ 131}**   "In general, 'counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court.' "  *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, ¶ 125, quoting *Treesh*, 90 Ohio St.3d at 490. *See Columbus v. Oppong*, 10th Dist. No. 15AP-1059, 2016-Ohio-5590, ¶ 30, citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 244 (noting the "decision not to * * * call a certain witness is often a matter of trial strategy as the resultant testimony may be unpredictable or even unfavorable to the defendant"); *State v. Wiley*, 10th Dist. No. 03AP-340, 2004-Ohio-1008, ¶ 28, quoting *State v. Hector*, 2d Dist. No. 18653 (Mar. 8, 2002) (stating that " '[c]ourts are reluctant to find on direct appeal that an attorney has been ineffective for failing to call a witness, because it is difficult to show on direct appeal that a witness's testimony could have changed the outcome of the trial' ").

{¶ 132} However, as defense counsel subpoenaed Det. Mall, this does not appear to be a case where counsel made a strategic decision not to present Det. Mall's testimony. *See State v. Jones*, 10th Dist. No. 15AP-670, 2017-Ohio-1168, ¶ 27. Rather, the record demonstrates Det. Mall failed to appear at trial despite being subpoenaed.

{¶ 133} Appellant asserts Det. Mall's testimony was necessary to "counter the State's reliance [on the photo array] by attacking the credibility and reliability of the identification, including all parts done incorrectly as discussed more fully in the First Assignment of Error." (Appellant's Brief at 42.) However, as stated in our analysis of appellant's first assignment of error, Det. Mall substantially complied with R.C. 2933.83 and the Training Supplement when administering the photo array to Mora. Moreover, as defense counsel did not proffer what Det. Mall would have testified to at trial, or submit an affidavit from Det. Mall, appellant's contention that Det. Mall's testimony would have helped his case is speculative. *See State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 41 (finding that, as there was "no affidavit or other evidence in the record indicating what [the witness] would have said had he testified at trial, defendant's contention that the [witness's] testimony would have helped his case is pure speculation"); *State v. Peck*, 2d Dist. No. 21354, 2006-Ohio-5796, ¶ 64-65; *State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 62.

{¶ 134} Defense counsel did state that if Det. Mall appeared at trial, counsel would "ask him the same questions that [counsel] asked him at the [suppression] hearing." (Tr. Vol. III at 562.) Following the suppression hearing, the trial court found Det. Mall to be extremely credible and that he complied with R.C. 2933.83 and the Training Supplement. Appellant fails to demonstrate a reasonable probability that, had Det. Mall testified at trial, the jury's perception of Det. Mall's testimony would have differed from the trial court's earlier perception of the testimony. As Mora testified on direct and cross-examination regarding the photo array, Det. Mall's testimony would have served to merely corroborate Mora's testimony. Indeed, had Det. Mall testified, he would have reinforced that Mora did, ultimately, select appellant's photo from the array.

{¶ 135} Accordingly, appellant fails to demonstrate that, had Det. Mall testified at trial, the testimony would have helped his case or altered the outcome of the trial. *See Toledo v. Brandeberry*, 6th Dist. No. L-13-1080, 2014-Ohio-1148, ¶ 15, 17 (finding no ineffective assistance of counsel where counsel allowed "the case to proceed to trial despite

the fact that the police officers he had subpoenaed failed to appear at trial," as the defendant "provided nothing—to suggest that the officers would have provided testimony that would have benefited [the defendant]"). As such, appellant fails to demonstrate that his trial counsel rendered ineffective assistance by failing to ensure Det. Mall testified at trial.

{¶ 136} Lastly, appellant contends the cumulative effect of his trial counsel's individual errors deprived him of due process and a fair trial. Under the doctrine of cumulative error, "a judgment may be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though the errors individually do not rise to the level of prejudicial error." *State v. Johnson*, 10th Dist. No. 10AP-137, 2010-Ohio-5440, ¶ 34, citing *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). However, as we have found no merit to any of appellant's individual claims of ineffective assistance of counsel, "cumulative error cannot be established simply by joining those meritless claims together." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 170. *Accord Columbus v. Beasley*, 10th Dist. No. 17AP-629, 2019-Ohio-719, ¶ 80; *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 173. Accordingly, appellant fails to demonstrate cumulative error.

{¶ 137} Based on the foregoing, appellant's sixth assignment of error is overruled.

**X. Conclusion**

{¶ 138} Having overruled appellant's seven assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT, P.J., & JAMISON, J., concur.

———————